UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

VELVET ANN SAULSBERRY,

    Plaintiff,

v.

    Case No. 5:23-cv-377-TJC-PRL

BILLY WOODS, in his official capacity as Sheriff of Marion County,

    Defendant.

# O R D E R

**THIS CASE** is before the Court on Defendant Woods' Amended Motion for Final Summary Judgment, which has been fully briefed. Docs. 64, 73, and 76. Plaintiff Velvet Saulsberry has brought two cases against the Defendant, Sheriff Billy Woods. This is the second lawsuit, and it alleges the Sheriff retaliated against Saulsberry based on the earlier litigation and interfered with Saulsberry's rights as a property owner.[1]

## I. BACKGROUND

    a. <u>Saulsberry's Prior Lawsuit and Employment with the Sheriff</u>

Saulsberry worked for the Sheriff from 2006 until her termination in 2018. Saulsberry's first lawsuit alleged her lack of promotion and termination

---

[1] Marion County was a party to this lawsuit but has since settled.

were due to race discrimination. Doc. 47 in 5:20-cv-570.[2] Saulsberry filed the first lawsuit on November 23, 2020. Doc. 1 in 5:20-cv-570.

### b. Saulsberry's Property Dispute

In July 2021, Saulsberry purchased property of almost three acres. The property included a dirt roadway, which her property survey showed as Saulsberry's property, not subject to an easement or other public use. See Doc. 72-27 ¶ 60. After Saulsberry purchased the property, it became evident there was a dispute about access to the dirt roadway. See id. ¶ 58. Saulsberry's position was that the dirt roadway was her driveway, and neighbors improperly used it to access their property and to harass her, including racial slurs.[3] Doc. 73 at 3. Saulsberry is Black, while the former property owners and her neighbors are white. See Doc. 73 at 3.

The property dispute is relevant here, but this case does not seek to establish or clarify property rights. Instead, the issue here is the Sheriff's response to the property dispute.

---

[2] The Court has today granted summary judgment in favor of the Sheriff in the first lawsuit. Saulsberry v. Woods, Doc. 92 in 5:20-cv-377.

[3] Saulsberry's affidavit states the slurs started after she tried to block access. Doc. 72-27 ¶ 95.

2

### c. Sheriff and County Response to Fence Post Complaints

The dispute escalated on Friday, January 14, 2022, after Saulsberry installed fence posts to block access to the dirt roadway. See Doc. 72-27 ¶¶ 58–63. Complaints were made to the Sheriff and the county, and the response ultimately included four law enforcement officers and three county employees.[4] Docs. 72-23, 72-24, 72-25, 72-26, and 72-43; Doc. 62-1 ¶ 7.

Two officers responded first, joined later by Sergeant Winkler. See Doc. 72-27 ¶¶ 58–62. There are five videos from Winkler's body camera, starting at 4:30 p.m. and ending around 7:35 p.m. (total video is almost 109 minutes). Docs. 72-23, 72-24, 72-25, 72-26, and 72-43. Lieutenant Andrews arrived between 5:37 p.m. and 6:12 p.m. Compare Doc. 72-25 (Andrews not present) with Doc. 72- 26 (Andrews present). The county employees were Elton Holland, Marion County Engineer; Jared Pelz, Assistant County Engineer for Road Maintenance; and another employee sent to install barricades, if needed. Doc. 62-1 ¶¶ 2–7; Doc. 72-25.

The video shows officers and county personnel interacted with each other, Saulsberry, and at least one of her neighbors. Docs. 72-23, 72-24, 72-25, 72-26,

---

[4] Saulsberry alleged the county employees were there at the request of one of the law enforcement officers, Sergeant Winkler, because Winkler was seeking someone "who would be willing to confirm that Plaintiff's dirt driveway was a public road." Doc. 73 at 4. The video shows Winkler on the phone with a different county employee. Doc. 72-24. The record indicates calls had been made to the county customer service center and the Sheriff. Doc. 72-43; Doc. 62-1 ¶ 7.

3

and 72-43. Winkler consulted the county by phone before Pelz and Holland arrived. Doc. 72-24. Pelz and Holland consulted county records, assessed and measured portions of the property. Docs. 72-25, 72-26, and 72-43. Saulsberry explained her position about why she could block access, including her survey, which did not show a county road or easement. Doc. 72-27 ¶ 60; see Docs. 72-23, 72-24, 72-25, 72-26, and 72-43.

Holland and Pelz decided the posts should be removed. Doc. 62-1 ¶ 9; Doc. 72-26 (starting at 18:53). Pelz explained his reasons included (1) a 1951 survey that indicated property along the section line had been deeded to the county, (2) signage indicated the dirt roadway was an unmaintained county road, and (3) safety concerns about the blocked access in light of ongoing public use. Doc. 73 at 2; Docs. 72-24, 72-26, and 72-43; see Doc. 62-2. Pelz informed the officers and Saulsberry of the need to remove the posts and, assisted by others, he removed them.[5] Doc. 73 at 4-5; Doc. 62-1 ¶ 10; Doc. 72-26 (starting at 18:54). Holland told Saulsberry the county would do additional investigation, including a survey. Doc. 72-26 (starting at 18:54).

After the county's explanation and removal of the posts, Winkler advised Saulsberry that blocking access to something considered a public roadway was

---

[5] Saulsberry requested the officers write up a citation for theft, but the posts were not removed from her property. See Doc. 72-28 at 168–69; Doc. 62-1 ¶¶ 10–11; Doc. 72-7 at 4.

a misdemeanor and could result in her arrest. Doc. 72-43 (19:11); see Doc. 64 at 7–8, n.3. Saulsberry viewed this as a threat to arrest her if she blocked public access to the dirt roadway. See Doc. 73 at 5. Saulsberry was not arrested, then or later. Doc. 72-28 at 167, 178–79.

### d. Further Interactions with the County

The next month, on February 22, 2022, Matthew Minter, County Attorney, wrote Saulsberry, concluding "Marion County believes the evidence presented establishes that the dirt roadway along the western boundary of your property has been openly and regularly used as a point of ingress and egress by the motoring public for decades." Doc. 62-2 at 303. The letter also asked that she "not construct any buildings or fences in this area given the high probability of accidents or injury to persons utilizing the roadway . . . ." Id. The letter summarized the basis for the findings and attached supporting materials, including maps and recorded instruments.[6] Id. The letter advised Saulsberry to "consult with and retain the services of a private attorney . . . if she wish[ed] to litigate the issue," and reminded her county personnel had previously given the same advice. Id.

On April 6, 2022, Minter sent Saulsberry an email, summarizing their conversation, stating "the county is not taking the position that the road in

---

[6] Copies of this letter were also sent to the Sheriff and surrounding private property owners. See Doc. 43-1.

5

question is a 'County' road" and he "did not believe the County would be filing a lawsuit against [her] to determine the rights of the County government with respect to the road." Doc. 72-44. It also said the "potential parties to a lawsuit are the private property owners who have been using that road" and the materials cited in the earlier letter "clearly establish that the road has been openly and regularly used for years." Id. The email mentioned the neighboring property owners might be able to establish a prescriptive easement based on prior use and the "appropriate resolution is to [file] an appropriate civil action in order to obtain a judicial determination of the rights of the respective parties." Id.

Almost two years later, on or around March 24, 2024, Saulsberry agreed to settle her claims against the county. Doc. 41; Doc. 43-1. As part of the settlement, the County Attorney agreed to "remove the street signs which improperly name the dirt roadway . . . and which are confusing the traveling public into believing that the subject dirt roadway on [her] property is a public street," and "acknowledge there is no public roadway on Saulsberry's property and that the County will not interfere with Saulsberry's right to fence her property to exclude others from driving across it." Doc. 43-1. The County Attorney agreed to send a letter to the Sheriff, other county officials, and residents who had received the earlier letter, with this information. Id.

e. Further Interactions with the Sheriff

About two months after the fence post incident, on March 15, 2022, Saulsberry filed a complaint against Winkler and Andrews. See Doc. 72-7. Three days later, the assigned investigator, Lieutenant Bazemore, notified Saulsberry the investigation was complete and did not support findings of misconduct by the officers. Id. The letter stated:

> Sgt. Winkler did advise you that if you were to close the road or block it in any way that you could be held accountable which could lead to an arrest and misdemeanor charge. He stated he was advising you this [sic] because he did not want you to get in trouble. At no time did he threaten to arrest you. He was merely providing you with information so that you could be aware of the laws.

Id.

On April 3, 2022, Saulsberry complained to the Sheriff about trespassing from neighbors. Initially, trespass warnings were issued to two neighbors, but these were quickly rescinded by Bazemore. Doc. 72-39 at 16–19, 29–30. Bazemore told Saulsberry the trespass warning could not be enforced because there was a county document showing a dedicated easement on the property.[7] Id. Bazemore's information was based on county documents, including the February 2022 letter from the County Attorney. Id.

---

[7] The officers who issued the trespass warnings were not aware of the prior incident or dispute. Doc. 72-39 at 16.

7

On April 16, 2022, Saulsberry complained to the Sheriff she had been threatened by a neighbor. Doc. 72-27 ¶93. Saulsberry alleges the Sheriff refused to respond to this complaint or other complaints she made later. Id. ¶¶ 94–95.

About seven months after her settlement with the county, on October 24, 2024, the Sheriff provided Saulsberry assurances she would not be criminally charged if she fenced off her property. Doc. 72-27 ¶ 108. The record does not provide details as to the form of the assurance and does not specify when and how assurance was requested.

## II. ANALYSIS

### A. Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe evidence in the light most favorable to Saulsberry. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014). Even so, the Court is not required to consider implausible inferences and may disregard testimony that is contradicted by a valid recording. See Brooks v. Miller, 78 F.4th 1267, 1278 (11th Cir. 2023) (directing courts to disregard testimony that is "completely and clearly contradict[ed]" by a valid

recording); see also Mize v. Jefferson City Bd. of Ed., 93 F.3d 739, 743 (11th Cir. 1996) ("A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'") (quotation and citation omitted).

### B. Count III – Retaliation[8]

A prima facie case of retaliation requires (1) protected activity, (2) a materially adverse action, and (3) a causal connection between the two.[9] Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013). Saulsberry argues she meets all three prongs.[10] The Sheriff disputes the third prong: causation.

One way to establish a causal connection is based on temporal proximity– when the adverse action occurs shortly after the protected activity, it supports

---

[8] Saulsberry is not pursuing her claims of race discrimination, Counts I and II. See Doc. 73 at 2 n.1.

[9] The retaliation claim is brought under the Florida Civil Rights Act and Title VII. "FCRA claims are analyzed under the same framework as claims brought under Title VII . . . ." King v. HCA, 825 F. App'x 733, 736 n.2 (11th Cir. 2020).

[10] Saulsberry's EEOC charge and lawsuit are protected activity. Saulsberry argues the alleged threat to arrest her and the Sheriff's failure to stop her neighbors from harassing her were adverse actions. The Court is skeptical as to whether there was a materially adverse action sufficient to support her claim because these circumstances do not impact Saulsberry's employment, which had ended years earlier. Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); see Muldrow v. City of St. Louis, 601 U.S. 346, 357 (2024) (noting Title VII's anti-retaliation provision requires the retaliatory action be "materially adverse" such that it would "dissuade [] a reasonable worker from making or supporting a charge of discrimination."). However, this is not addressed by the parties, and it is not necessary for the Court to decide.

9

a conclusion the two are causally connected. Grant v. Miami-Dade Cnty. Water & Sewer Dep't, 636 F. App'x 462, 468–69 (11th Cir. 2015) (citing Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)). Saulsberry argues there is a causal connection because the topic of her possible arrest came up shortly after she told Andrews of her original lawsuit, and because this was the first opportunity the Sheriff had to engage in retaliation for the 2020 litigation. See Doc. 73 at 16.

The interaction with officers was more than three years after Saulsberry's employment ended and well over a year after her lawsuit was filed. The timing supports a finding that her protected activity is not connected to the alleged adverse action.[11] Chandler v. Sheriff, Walton Cnty., No. 22-13698, 2023 WL 7297918 at *2 (11th Cir. Nov. 6, 2023) (citing Drago v. Jenne, 453 F.3d 1301, 1308) (11th Cir. 2006) (a gap of more than three months, without more, is too long to demonstrate a causal connection)).

There is no evidence that Saulsberry's prior lawsuit was a reason for the complaints from her neighbors or impacted how the Sheriff responded, either

---

[11] Saulsberry argues her only burden is to show the adverse action and protected activity are "not completely unrelated." Doc. 73 at 14–15 (citing Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998). Even though the Wideman language is fairly broad, the Wideman holding relied on close temporal proximity—that "the series of adverse employment actions commenced almost immediately after management learned she had filed the charge." Id. at 1457.

10

on January 14, 2022, or thereafter. Saulsberry was unhappy the fence posts were removed and with other aspects of the Sheriff's response. She complained. Bazemore investigated, including review of the videos, and concluded there was no misconduct. Nor do the January 14, 2022, videos support finding a causal connection between protected activity and an adverse action. The video confirmed Winkler informed Saulsberry she could be arrested under certain circumstances: if she blocked access to something deemed to be a public roadway. She was not arrested, and the possibility of arrest was not linked to Saulsberry's prior employment with the Sheriff or her 2020 lawsuit.[12] There was no indication any action by the officers was based on Saulsberry's protected activity.

Accordingly, summary judgment is due to be granted on the retaliation claim.

### C. Count IV – Inverse Condemnation

Saulsberry argues the Sheriff's "delayed recognition" of her property rights facilitated "trespasser access for more than 32 months" and was a temporary taking of her property. See Doc. 73 at 23. Specifically, she complains the alleged threat of arrest interfered with her right to control access to her property and was a compensable temporary taking. Deciding whether a taking

---

[12] The video demonstrates the benign nature of the interaction. See Doc. 72-43 (19:11).

11

occurred is a fact-specific inquiry. Chmielewski v. City of St. Pete Beach, 890 F.3d 942, 949 (11th Cir. 2018) (citation omitted).

Relevant to the taking claim and to assess the Sheriff's response, Saulsberry details two complaints and mentions others generally. The first complaint was January 14, 2022, after Saulsberry installed fence posts.[13] The second complaint was April 16, 2022, from Saulsberry about her neighbors. Saulsberry alleged she complained again in April 2022, and various other times (not specified), and the sheriff refused to respond.[14] Also relevant, months after the settlement with Marion County, the Sheriff provided reassurance to Saulsberry she would not be arrested for blocking access to the dirt roadway.[15]

The Sheriff and county both were alerted to the property dispute on

---

[13] Saulsberry's complaint to the Sheriff about the officers' behavior on January 14, 2022, was not a separate incident about property access, but provided additional information as to the Sheriff's position. See generally Doc. 72-7.

[14] The record includes body cam footage from another interaction between Saulsberry and officers on August 21, 2022, but Saulsberry does not specifically argue about any part of this interaction. See Doc. 64 at 10, Docs. 62-4-6-7, 62-4-7 (videos); Doc. 73.

[15] Saulsberry complains the reassurance was delayed but the record does not provide details to show what request was made or when. See Doc. 72-27 ¶ 108. Saulsberry alleges two county employees admitted they advised the officers the driveway was not a county road. Doc. 72-27 ¶ 76. This allegation does not create a material fact dispute because it fails to identify the county employees, either by name or title; does not provide details about their authority to make such a determination; does not identify when this information was provided to the Sheriff or include any additional information about what was said.

January 14, 2022. County employees, not the officers, decided the fence posts should be removed based on safety concerns and because the property rights were unclear. The county investigated further and communicated with Saulsberry about its findings. The February 2022 letter and April 2022 email both mention public use of the dirt roadway had been ongoing and that others might have a legal right to continued access, even though the email indicated the county was unlikely to seek any property rights for itself and did not claim the dirt roadway was a county road. The county advised Saulsberry, several times, to consider seeking judicial resolution.

Essentially Saulsberry argues because the Sheriff would not issue trespass warnings to her neighbors and cautioned her against blocking access, she was denied her fundamental property right to exclude others. See Cedar Point Nursery v. Hassid, 594 U.S. 139, 149 (2021) (noting the right to deny access is a treasured property right). Saulsberry relies on Chmielewski v. City of St. Pete Beach to support her claim of a taking, but it is distinguishable. 890 F.3d 942, 949 (11th Cir. 2018).[16] Chmielewski affirmed a taking occurred because "the City encouraged public occupation by placing beach access signs, hosting events at the property, and refusing to remove trespassers." Id.

---

[16] The Court is aware of the Eleventh Circuit's recent decision, finding a taking occurred when property owners were denied access to their beachfront property, but that holding and reasoning do not impact the decision here. See Alford v. Walton Cnty., 159 F.4th 844 (11th Cir. 2025).

13

Here, the only action by the Sheriff was not issuing (and rescinding in one case) trespass citations based on the county's position of potentially competing property rights. In short, the property rights were unclear, and the Sheriff did not take a side—it deferred to the county's opinion. The Sheriff's action or inaction to resolve the property dispute does not meet the requirements of a taking. Cf. United States v. Miller, 659 F.2d 1029 (10th Cir. 1981) ("criminal process should not be used for the purposes of settling a land dispute").

Accordingly, it is hereby

**ORDERED:**

1. Defendant Woods' Amended Motion for Final Summary Judgment, Doc. 64, is **GRANTED**. The Clerk should enter judgment in favor of Defendant Billy Woods and against Plaintiff Velvet Ann Saulsberry.

2. Plaintiff's Motion to Bifurcate Trial and for Modification of Scheduling Order, Doc. 66, is **DENIED as moot**.

3. The Clerk is directed to close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 10th day of December, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record